571 F.2d 708
 Fed. Sec. L. Rep. P 96,308, 2 Fed. R. Evid. Serv. 1257
UNITED STATES of America, Appellee,
v.
David STIRLING, Jr., William G. Stirling, Harold M.
Yanowitch, Edwin J. Schulz and Rubel L. Phillips,
Defendants-Appellants.
 Nos. 33, 50, 66, 67, 68, Dockets 77-1140, 1141, 1144, 1177 and 1178.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1977.
Decided Feb. 2, 1978.
 
 William B. Lawless, New York City (Allen P. Rosiny, Hawkins, Delafield & Wood, New York City, of counsel), for defendants-appellants David Stirling, Jr. and William G. Stirling.
 Bernard S. Meyer, Mineola, N. Y. (William B. Lawless, Allen P. Rosiny, Hawkins, Delafield & Wood, New York City, Meyer, English, Cianciulli & Peirez, P. C., Mineola, N. Y., of counsel), for defendant-appellant Harold M. Yanowitch.
 Douglas F. Eaton, New York City, for appellant Edwin J. Schulz.
 Michael B. Mukasey, New York City (Robert P. Patterson, Jr., W. Peter Burns, Patterson, Belknap, Webb & Tyler, New York City, of counsel), for appellant Rubel L. Phillips.
 Angus MacBeth, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, W. Cullen MacDonald, Frederick T. Davis, Asst. U. S. Attys., Southern District of New York, New York City, of counsel), for the United States of America.
 Before LUMBARD, OAKES and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal by David Stirling, Jr., William G. Stirling, Harold M. Yanowitch, Edwin J. Schulz, and Rubel L. Phillips from judgments of conviction entered on March 11, 1977, in the United States District Court for the Southern District of New York, Marvin E. Frankel, Judge, after a six-week jury trial. Appellants were convicted of securities and mail fraud and conspiracy in connection with sales of stock in the Stirling Homex Corporation ("Homex"). Specifically, appellants were convicted of violating and, under 18 U.S.C. § 371, conspiring to violate §§ 17 and 24 of the Securities Act of 1933, 15 U.S.C. §§ 77q(a) and 77x, and 18 U.S.C. § 1341. Appellants were also convicted of conspiring to violate 15 U.S.C. § 78ff and 18 U.S.C. § 1001. We affirm.
 
 
 2
 Homex manufactured and assembled prefabricated multi-family modular housing. Its operations consisted of mass-producing individual apartment units, or "modules," using assembly-line production techniques, shipping them to a construction site and installing them in a previously-constructed concrete and steel frame so as to form multi-unit apartment buildings. Each of the appellants served Homex in one or more official capacities, and each had a considerable stake in Homex's financial success. David Stirling, Jr., was Chairman of the Board and Chief Executive Officer; he owned approximately two million shares of Homex common stock. William G. Stirling was President, Chief Operating Officer and a member of the Board; he, too, owned approximately two million shares. Harold M. Yanowitch was Executive Vice-President, Chief Legal Officer and a member of the Board; he owned approximately 160,000 shares. Edwin J. Schulz was Senior Vice-President of Operations, Controller and Principal Accounting Officer; he owned 3,200 shares. Rubel L. Phillips was Southern Region Vice-President; he owned an option to purchase 40,000 shares.
 
 
 3
 Count One of the nine-count indictment charged that the appellants defrauded Homex shareholders, officers, directors, auditors and others in registration statements filed in 1970 and 1971 with the Securities Exchange Commission ("SEC") covering the public offer and sale of common and preferred Homex stock. The government charged that this was accomplished by inflating reported earnings and by falsifying and concealing adverse material information in violation of 15 U.S.C. § 77q(a)[1] and 15 U.S.C. § 77x.[2] Count Two charged that appellants wilfully and knowingly made and caused to be made untrue statements of material facts, and failed to disclose material facts necessary to correct the misleading statements, in the 1971 registration statement filed with the SEC covering the public offer and sale of Homex preferred stock, also in violation of 15 U.S.C. § 77x. Counts Three through Eight charged that appellants devised a scheme to defraud Homex securities purchasers and others, to obtain money and property by means of fraudulent representations, and to implement the scheme by using the United States Postal Service, all in violation of 18 U.S.C. § 1341.[3] Specifically, appellants were charged with mailing on separate occasions two prospectuses, two annual reports and two quarterly reports to shareholders. Finally, Count Nine charged that appellants conspired to defraud the United States and the SEC and to violate 18 U.S.C. § 1001[4] and 15 U.S.C. § 78ff[5] as well as 18 U.S.C. § 1341 and 15 U.S.C. §§ 77q(a) and 77x, such conspiracy being in violation of 18 U.S.C. § 371.[6] The jury found each appellant guilty of each charged violation.[7]
 
 
 4
 The story is a complicated one, involving land transactions that were not what they were claimed to be, labor relations that were not only inappropriately "cozy" but undisclosed, contracts for module sales based upon guile and trickery rather than agreement, and deceptive bookkeeping practices for which appellants have finally been held accountable. The record shows that appellants engaged collectively in a calculated and multifaceted plan to give the investing public the false impression that Homex was in a sound and steadily improving financial position and at the same time withhold adverse information that was material to an accurate appraisal of the company's prospects. The enterprise began in 1968; in 1970 and 1971 Homex stock was sold to the public for a total of $39 million; in 1972 the company was bankrupt. The jury could permissibly have found the following.
 
 I. THE FOUNDATIONS:
 INCORPORATION AND GOING PUBLIC
 
 5
 Homex was incorporated as a close corporation in Delaware in 1968; its principal offices and factory were located in Avon, New York, a suburb outside Rochester. The Stirling brothers were its founders, officers and principal owners. Shortly after incorporation, Homex made a private offering, selling 1.6 million shares at $1 each. It thus began as a relatively small concern, doing business primarily with private residential projects developed by the Stirlings. It soon became clear, however, that it would be in the best business interests of Homex to exploit the then-budding public housing market. Accordingly, Homex focused its efforts on sales to public housing authorities in federally-financed housing programs.
 
 
 6
 In late 1968, the Stirlings decided to explore the possibility of "going public" and approached R. W. Pressprich & Co. as a prospective underwriter. Pressprich agreed to underwrite the public sale of Homex common stock on the condition that Homex's annual net earnings totaled $1 million, as projected by the Stirlings. In January of 1969, when the agreement with Pressprich was reached, Homex was reporting profits at the end of the second quarter of approximately.$390,000 from the sale of modules and gross land sales totaling $4.7 million.
 
 
 7
 By April 30, 1969, however, the end of the third quarter, it became obvious that year-end profits would fall far short of the $1 million required for the underwriting, third quarter gross sales totaling only $900,000. At this point Homex arranged two "sales" of land holdings in order to boost total sales and profits to the amount required for the Pressprich underwriting.
 
 
 8
 The Kece Land Sale.
 
 
 9
 Peter Thun was the general partner of a limited partnership called Hollyrood Park Associates, located in Clay, New York; the Stirlings were limited partners. In May, 1969, David Stirling offered Thun two parcels of land owned by a Homex landholding subsidiary, Hollyrood Park II, Inc. Thun had a right of first refusal on both parcels. He indicated that he was interested in only one of the parcels the one adjacent to his Hollyrood Park project but only if it were part of an economically reasonable package consisting of both the purchase of the land for $325,000 and the development by Homex of a plan to build a 330-unit modular apartment building. In other words, he was interested in the land only if apartment units could profitably be built on it. Because Stirling was unable to quote a price for the development of such an apartment complex, Thun arranged to have the land purchased by Kece Associates, Ltd., a newly-formed shell corporation, in such a way as to maintain control over the land and at the same time incur minimal risk. Kece Associates made a 10 percent down payment, assumed existing mortgages on the property and gave a purchase-money mortgage that required interest payments and an annual principal reduction of $10,000 for the first five years.
 
 
 10
 In practical effect, as the government suggests, this $325,000 "sale" was a purchase by Thun of an "option" on the land. Indeed, Thun himself so characterized the practical effect of the arrangement. He stated that if it had been otherwise he would not have considered entering into it at all. Under the agreement, if Thun were to decide that the construction of a 330-unit apartment project would not or could not be financially advantageous, he could merely order the termination of mortgage payments and, while relinquishing all rights to the land, shed all mortgage responsibilities. The mortgage itself included exculpatory language of the sort commonly found in non-recourse loan agreements. It provided that, upon default by Kece, the Homex subsidiary could foreclose only on the property and could not pursue Kece's or Thun's assets to satisfy the mortgage. Thun viewed the arrangement as one in which he paid money to control the land and, if the arrangement proved ill-fated, one in which his liability was limited.
 
 
 11
 The transaction was closed on June 3, 1969. Subsequently, appellant Yanowitch wrote a letter on behalf of Kabeth Properties, Inc., another wholly-owned subsidiary of Homex, to Riverbend Estates, Inc., formed by Thun to hold title to the land, confirming the understanding between Kabeth and Riverbend that the Homex units would be designed and manufactured at published prices and that the cost of installing them would be one that the parties agreed upon in the future as reasonable. Thun, meanwhile, told the other Hollyrood Park partners that he had purchased the land at his own personal risk and that, if the apartment complex materialized, he would sell the developed land to the partnership at cost.
 
 
 12
 The Reseac Land Sale.
 
 
 13
 Also in June, 1969, appellant Yanowitch spoke to Cesare Falcone, Donald Barbato and Dr. Morris Shapiro about purchasing the parcel of Hollyrood Park II land that Peter Thun did not want. Homex sought $435,000 for the parcel and was willing to accept an $80,000 down payment and a purchase-money mortgage. Yanowitch made assurances that the land could be zoned so as to allow for the construction of a financially productive shopping center. Added to these generally favorable investment conditions was the fact that Gulf Oil Corporation owned an option on 3/5 of an acre of the parcel, the exercise price of which was $100,000. Still, the prospective purchasers expressed reluctance. Yanowitch, and eventually David Stirling, then assured them that, if anything went "awry," Homex would either repurchase the land or find another purchaser. In effect, the purchasers were assured that they would not lose money on their investment. This assurance was repeated prior to closing when complications developed regarding a zoning ordinance that prohibited the type of shopping center facilities the purchasers were interested in constructing. Yanowitch assured them that a variance would be obtained. Yanowitch also told them that they would be "getting some stock in Stirling when it went public." Homex declined to enter into a written indemnification agreement, but it is clear that Falcone, Barbato and Shapiro believed that, if they agreed to enter into the purchase agreement, Homex would protect them from losses.
 
 
 14
 The deal was closed on August 18, 1969, after the end of the fiscal year; the deeds were back dated to June 30, 1969. Falcone, Barbato and Shapiro had created Reseac Realty, Inc. ("Reseac"), to purchase the land, which it did by transferring $80,000 as down payment, assuming $30,000 and $13,000 mortgages on the property and granting a $302,000 purchase-money mortgage. No principal payments were required for the first three years.
 
 
 15
 HKF Audits the 1968-1969 Fiscal Year.
 
 
 16
 On August 27, 1969, the accounting firm of Harris, Kerr, Foster & Company ("HKF") certified the Homex financial records for the 1968-1969 fiscal year. HKF certified for inclusion as income the $325,000 receivable from the Kece transaction and the $425,000 receivable from the Reseac transaction. The inclusion of these two "sales" boosted Homex's net income after taxes slightly above the $1 million required for the Pressprich underwriting.
 
 
 17
 During the audit, Yanowitch told HKF that he had personal knowledge of Reseac's ability to honor its mortgage commitment and that, in the event of a default by either Kece or Reseac, the land could easily be sold to satisfy the mortgages. Yanowitch told HKF that the agreed-upon design and manufacture of modules for the Kece property would be at published prices; he failed to tell HKF that the parties had not agreed upon the cost of installing the modules other than to say it would be reasonable. In other words, he did not tell HKF that the completion of the "sale" depended upon certain conditions being met by Homex in the future. Yanowitch also neglected to tell HKF of the assurances made to Reseac regarding the zoning restriction and of the commitment by Homex to repurchase the land or arrange for a purchaser if anything went wrong. Finally, although he told HKF that Homex and Reseac had no stockholders in common, he did not tell HKF that promises had been made to Falcone, Barbato and Shapiro that arrangements would be made for them to purchase Homex stock at the anticipated public offering for the issue price.
 
 
 18
 The 1970 Registration Statement.
 
 
 19
 On October 1, 1969, Homex filed a registration statement with the SEC in connection with the issuance of Homex common stock. It made scant mention of the Kece and Reseac land transactions:
 
 
 20
 Two sales of undeveloped land acquired at the time of organization of the Company accounted for approximately 18% Of the Company's net income during its first fiscal year. The larger parcel was purchased by a developer who subsequently entered into an agreement with the company to purchase modular housing for installation on such land.
 
 
 21
 The registration statement became effective on February 19, 1970, for a total sale of 1,175,000 shares of Homex common stock at $16.50 per share, netting Homex approximately $20 million.
 
 
 22
 II. THE SCHEME AS ASSEMBLED: STAYING "PUBLIC".
 
 
 23
 HKF Audits the 1969-1970 Fiscal Year.
 
 
 24
 During August and September, 1970, HKF again met with Homex, this time to certify the financial records of Homex for the 1969-1970 fiscal year. In connection with this audit, Paul Kuveke, then Executive Vice-President and Treasurer of Homex, wrote a letter to HKF stating that, although both the Kece and Reseac mortgages were in default in the amount of $559,624 as of the end of the fiscal year, Homex nevertheless considered them "collectible" and properly recognizable as income for auditing purposes. He cited as reasons for this belief the receipt from Kece on September 27, 1970, of a payment that brought its obligations up to date; the expectation that a Reseac payment would also be received, given what appeared to be favorable business conditions for Reseac; and a recent appraisal of the parcels that placed the fair market value of the Kece land at $310,000 and the Reseac land at $403,650.
 
 The Kece Mortgage Payment
 
 25
 The Kuveke letter failed to disclose to HKF the rather complicated set of transactions that "facilitated" the September 27, 1970, Kece mortgage payment. Thun and the Stirlings were involved in a number of enterprises besides Hollyrood Park Associates. Among these were Fairway Associates, the owner of an apartment development in Rochester, New York; Mobile Townes Corporation, the owner of a mobile home park in Syracuse, New York; and Pennscott Properties, a management company for Mobile Townes.
 
 
 26
 In September, 1970, a dispute arose regarding claims by Homex that Thun and his various enterprises owed approximately $90,000 to Homex and its subsidiaries. From the record, it appears that this $90,000 consisted of approximately $34,000 due Homex for the construction of a clubhouse on Hollyrood Park property, approximately $35,000 on a demand note held by Homex and, apparently, approximately $23,000 due on September 2, 1970, as mortgage payment on the Kece-Riverbend parcel. It was Thun's opinion that the best way to clear up the confusion was for his enterprises to buy out the Stirlings' interests in Mobile Townes and Pennscott, thereby simplifying the ownership of the various corporations and at the same time providing payment to the Stirlings.
 
 
 27
 Jack Doerge, a director of Mobile Townes, indicated to Thun that he was interested in acquiring additional Mobile Townes stock and would transfer $90,000 for that purpose. $90,000 was delivered to Al Bartz of Homex in exchange for Pennscott and Mobile Townes shares held by the Stirlings. The Mobile Townes stock was not, however, delivered that day. Instead, it was placed in escrow until Thun confirmed to HKF the authenticity of the purchase-money mortgage on the Kece-Riverbend property. On October 5, 1970, Thun confirmed to HKF that the mortgage was authentic. In effect, then, the same $90,000 that was used to purchase the Stirlings' stock in Pennscott and Mobile Townes was used to satisfy the disputed $90,000 indebtedness. At the same time, and in the same transaction, ownership of valuable stock was transferred, $90,000 worth of debts was forgiven, and Homex could present to its auditors a confirmed and therefore arguably collectible mortgage to support its recognition as income.[8]
 
 Reseac Developments
 
 28
 The Kuveke letter to HKF also failed to reveal significant background information regarding the Reseac land transaction. On July 16, 1970, Gerald Beckerman, the attorney for Falcone, Barbato and Shapiro, met with Carl Wren, Homex's Director of Market Research, and Ruben Davis, assistant to Yanowitch, in an effort to resolve problems that had developed regarding the property sold to Reseac. The problems were considerable: contrary to Homex's assurances, the zoning restriction had not been lifted; Falcone, Barbato and Shapiro had become "quite disillusioned" with the property and were no longer inclined to develop or retain it; Reseac had no cash and could not make the interest payment due on July 1, 1970; and, finally, Reseac could not pay the real estate taxes or the obligations on the assumed mortgages. In short, Falcone, Barbato and Shapiro wanted Homex to make good on its promises either to repurchase the land or arrange for another purchaser.
 
 
 29
 Wren and Davis made it clear to Beckerman that, although the land was considered to be a good financial value, Homex would not repurchase it. They did, however, offer to assist in the sale or development of the property. Beckerman indicated that Falcone, Barbato and Shapiro would be willing to continue in the arrangement as long as there was a waiver by Homex of the mortgage payments, a condition that Homex found unacceptable. The meeting was amicable, but it clearly met neither the hopes nor the expectations of the Reseac Principals. Kuveke's letter mentioned none of this.[9]
 
 Accounting Practices
 
 30
 The HKF audit of Homex's 1969-1970 financial condition prompted Homex again to shade the truth, this time in connection with the accounting methods utilized by the corporation. Typically, a Homex contract would state one price for the design and manufacture of modules and another price for their installation. At one time, Homex used sales contracts that transferred title and risk of loss to the buyer upon delivery of the finished apartment module to an independent carrier. When this contract was used, Homex recorded income from the sale of the module as of the moment the module was delivered to the carrier. During the 1969-1970 fiscal year, however, Homex changed to a "turn key" contract under which Homex retained title and risk of loss until installation was complete and a closing had occurred. Thus, the sale was not complete until after the closing, when the new owner could actually claim possession and "turn the key." For obvious reasons, waiting to recognize income until the day that the key was turned troubled Homex officials. Homex, through Schulz, wanted HKF to certify as income the value of sales contracts for modules that, although not yet delivered or installed, had been "manufactured and assigned to specific contracts." This method of calculation allowed Homex to recognize the manufacture price of a module as income long before it actually received any cash for that module.
 
 
 31
 During the 1969-1970 fiscal year, Homex also changed the provisions of its contracts dealing with installation. Where once Homex had not recorded any portion of the installation price as income until the installation was complete, Homex now wanted HKF to recognize as income that proportion of the installation price equal to the proportion of the installation completed. This system of recognition is called the "percentage of completion" method.
 
 
 32
 To support these methods of recognizing income, Schulz contacted and eventually retained Dr. Joseph A. Mauriello, an accounting professor at the New York University Graduate School of Business Administration. As a result of the conversations with Schulz, Dr. Mauriello submitted to HKF an opinion supporting Homex's income recognition system, and HKF approved of its use. What Schulz did not reveal to Dr. Mauriello, or to HKF, however, was the so-called "Christman Incident." Earlier in 1970, David Christman, an assistant controller in Homex's installation division, had discovered that profits for the installation phase of Homex operations were going to be one-half million dollars less than what they had been projected to be. Schulz instructed Christman to "delay recordation of the accounting entry embodying that calculation" until after the close of the fiscal year. This delay prevented the reduction of the installment division's 1969-1970 profits by 60 percent and the reduction of Homex profits for that period by 11 percent. According to Dr. Mauriello, had the delay been disclosed to him, it would have altered his opinion regarding the propriety of the income reporting methods of the installation division.
 
 
 33
 The Route 57-31 Land Sale.
 
 
 34
 In December, 1970, Harold L. Wynn, Jr., and William Grago, Jr., partners in the Empire Pipeline Corporation, and their attorney, Carmen Grasso, met with David Stirling to discuss the purchase of 138 acres of land at the intersection of routes 57 and 31 in Clay, New York. The land was owned by Homex's land-holding subsidiary, Kabeth Properties, Inc. The purchase price of the land was.$2.1 million. A 30-acre portion of the land was then the subject of a state condemnation proceeding, for which an award of $1 million was anticipated.
 
 
 35
 Wynn told Stirling that, although the purchase price seemed fair, the three of them could not afford to make the investment. Stirling suggested that the condemnation award could go toward the purchase price and that he would accept a 10 percent down payment of $210,000 and a purchase-money mortgage with no principal or interest due for five years. Wynn responded that they could not even afford the down payment. Stirling then proposed that Homex arrange financing in such a way as to enable them to "purchase" the land without transferring any money whatsoever to Homex, and went so far as to assure sufficient business activity to enable payment of obligations that did arise. Although Stirling declined to give a requested corporate guarantee against any investment losses, he did give his personal guarantee to that effect. The parties agreed.
 
 
 36
 In order to facilitate the "sale" without the transfer of funds, Stirling and Yanowitch instructed Charles Marshall, former banker and then Homex employee, to arrange a bank loan to Route 57-31 Development Corporation ("Route 57-31"), a shell corporation set up by Wynn and Grago to take title to the property. He was instructed to negotiate the loan with First National Bank of Rochester, New York, and to assign the condemnation award due Homex as collateral. First National then loaned $250,000 to Route 57-31, requiring the personal guarantees of Wynn and Grago on the note. This was in turn paid over to Kabeth Properties. No closing occurred and no deed was transferred.
 
 
 37
 On January 6, 1971, Yanowitch, Schulz and Ruben Davis, then Assistant Vice-President and Associate General Counsel of Homex, met with Dr. Mauriello to discuss recognizing as income the.$1.4 million profit on the "sale" of land to Route 57-31 for.$2.1 million. The purpose of the meeting was to secure Dr. Mauriello's favorable opinion for use during the audit of the 1970-1971 fiscal year. In particular they discussed SEC Accounting Series Release No. 95, which commented on the propriety of real estate transaction accounting methods that recognized as income any profits not received at the time the transaction was recorded.[10] Dr. Mauriello eventually advised HKF that the sale of land by Homex to Route 57-31 was a bona fide sale for which income could and should be recognized as of the date of the sale. Neither the true scope of the agreement between Homex and Route 57-31 nor the nature of the background financial arrangements supporting the agreement was disclosed to Dr. Mauriello. Nor were the Homex auditors, HKF and its eventual successor, Peat, Marwick, Mitchell & Co. ("Peat Marwick"), told of those details.
 
 
 38
 In fact, David Stirling, Yanowitch and Schulz tailored the Route 57-31 "sales contract" so as to avoid possible auditor objections, and ultimately represented that there were no undisclosed "assets pledged or assigned as security for liabilities" and "(t)hat the officers and directors of (Homex) had no direct or indirect relationship with Route 57 and 61 (sic) Development Corporation."
 
 
 39
 The Greater Gulf Coast Housing Development Corporation.
 
 
 40
 In late 1970, appellant Rubel Phillips, a Mississippi attorney, helped organize on Homex's behalf a group of Mississippi citizens into a non-profit public benefit corporation that would be eligible for federal, state and local financing of housing projects. The corporation was called the Greater Gulf Coast Housing Development Corporation ("Greater Gulf"). In December, 1970, Greater Gulf and Homex entered into two agreements. The first, for $100 million, called for the construction of a 5,000-unit housing project over a 6-year period, and was conditioned upon the modules being constructed in a Mississippi factory. The second, for $15 million, called for the construction of an 800-unit modular housing project over an 18-month period. These agreements, however, were effectively worthless unless and until Greater Gulf was successful in obtaining a funding commitment from appropriate government agencies.
 
 
 41
 Originally, the Greater Gulf projects were to be funded by the United States Department of Housing and Urban Development. By January, 1971, however, this plan was changed and funding was sought from the Farmers' Home Administration of the United States Department of Agriculture ("FHA"). During February, Phillips arranged for two FHA officials, S. B. Wise and W. T. Richardson, to visit Avon, New York, and to discuss with Yanowitch and David Stirling the commitment of FHA funds to Greater Gulf for the purchase of Homex modules. Wise and Richardson, however, were unable to authorize the funding commitment, a matter of some concern to Homex officials in that Homex had already chosen Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") to underwrite a July, 1971, issuance of Homex stock. This issuance required the filing of a second registration statement with the SEC, which in turn required a certification by Homex auditors of the financial records for the fiscal year up to January 31, 1971. About that time, Homex discharged HKF and retained Peat Marwick as auditors.
 
 
 42
 On February 24, 1971, Phillips secured the signature of Greater Gulf's volunteer President Kenneth Caron on a series of documents, including a sales contract between Homex and Greater Gulf which was backdated to December 28, 1970. Phillips explained to Caron that the backdating was merely for funding purposes. Phillips also told Caron that the contract was the same as an earlier $100 million agreement that Caron actually had signed in December, 1970, except that it provided for fewer units. Phillips did not call to Caron's attention the absence of the contract clause requiring the modules to be manufactured in Mississippi. Phillips also gave Caron a letter from Greater Gulf to the FHA requesting a $15 million loan and a response from the FHA, purportedly signed by Richardson, committing the FHA to the loan. Caron signed the FHA response in order to accept the loan. Richardson's signature on the FHA commitment was in fact forged at Phillips' instruction by his secretary. On the next day, February 25, 1971, Schulz instructed the Homex accounting department to credit Homex with the sale to Greater Gulf of 566 modules for $6,786,900. Later in the year, still without a valid contract or a genuine government funding commitment, Homex assigned another 60 modules to the Greater Gulf project in order to boost reported year-end revenues.
 
 
 43
 The forged commitment letter was kept by Yanowitch and used to the benefit of Homex on three important occasions. First, it was used to "assist" Dr. Mauriello in arriving at an opinion regarding the propriety of recognizing income from the Greater Gulf transaction. Second, it was shown to Homex's commercial bankers. Third, it was shown to Peat Marwick on March 19, 1971, to "aid" them in their audit of the financial records for purposes of the approaching issuance. The Greater Gulf sale was described to Peat Marwick verbally and supported by the backdated December 28, 1970, contract. It was also supported by a contract between Greater Gulf and the U.S. Shelter Corporation ("U.S. Shelter"), a wholly-owned financing subsidiary of Homex, in which Greater Gulf agreed to pay a finder's fee of $300,000 to U.S. Shelter for securing the $15 million federal funding commitment.
 
 
 44
 Accounting Practices During the 1970-1971 Fiscal Year.
 
 
 45
 Three incidents during the 1970-1971 fiscal year make it clear that Homex accounting practices during that time were considerably less than straightforward. First, a significant proportion of the modular sales recorded for the first quarter was based upon the assignment of modules to purported sales with housing authorities in Clay, New York, and Southbridge, Massachusetts. These sales were reported as income notwithstanding the fact that there existed neither written contracts nor funding commitments to support the assignments. The unaudited first quarter earnings were supplied to various commercial and investment bankers, eventually leading to an offer to purchase Homex debentures.
 
 
 46
 Second, beginning in December, 1970, Homex maintained not only a computer file showing assignment of particular modules to construction projects, but also a "special" or "simulation" file. Formally, these files were known respectively as File I and File II; computer room employees, however, called the first file the "real world" file and the second file the "Mickey Mouse" file. Mr. Wilbur Rumley, Scheduling Coordinator for Homex Operations Control, testified at trial that "on File I some apartments were assigned to one project and on File II they were assigned to another." In other words, the Mickey Mouse file was used by Homex to verify to its auditors that certain modules were assigned to certain contracts, thus justifying the inclusion of the price of those modules as income.
 
 
 47
 Finally, just prior to the filing of Homex's 1971 registration statement, an ambiguous debt confirmation gave Peat Marwick reason to question the inclusion by Homex of $832,000 as an account receivable. Homex had reported the figure as income notwithstanding the fact that it had been spent on the so-called "soft costs" of constructing the Mississippi plant, costs such as architectural and engineering fees and site selection costs. Such costs may be capitalized as costs of construction. Apparently on the theory that Mississippi authorities would one day reimburse it for the expenditures, Homex reported them under accounts receivable. As a result of Peat Marwick's inquiries, Homex shifted the $832,000 from accounts receivable to costs of construction in process.
 
 
 48
 The 1971 Registration Statement.
 
 
 49
 On April 21, 1971, Homex filed with the SEC a registration statement intended to cover the sale of 1,025,000 shares of Homex common stock. This was changed by amendment on May 28, 1971, to a new issue of 500,000 shares of Homex cumulative convertible preferred. On July 29, 1971, Merrill Lynch sold and distributed 500,000 shares of Homex preferred stock at $40 per share, netting Homex $19 million.
 
 Labor Relations
 
 50
 In draft, the section of the 1971 registration statement dealing with the labor relations enjoyed by Homex summarized its various labor agreements and noted that:
 
 
 51
 The Company believes that the above-mentioned agreements have contributed to its present satisfactory labor relations, but it can give no assurances that it will be free of labor problems in the future.
 
 
 52
 The final registration statement, however, contained no caveat regarding future labor relations. Nor did it reveal the intricate investment relationships that had developed between Homex and labor and which no doubt contributed to the "satisfactory labor relations."
 
 
 53
 In June, 1969, Homex entered into a labor agreement with the United Brotherhood of Carpenters and Joiners of America ("UBCJA"), the exclusive bargaining agent for Homex production employees. This in itself was a matter of some moment, for organized labor had expressed concern about the possibility that Homex-type production techniques would eliminate jobs in the housing and construction industries. Thus, Homex press releases described its relationship with the UBCJA as "precedent-setting." The government, however, claimed that the relationship was more accurately characterized as "cozy."
 
 
 54
 For example, UBCJA members and officials had, in November of 1968, helped convince the Akron, Ohio, Planning Commission Appeals Board, a municipal zoning authority, and the Akron City Council, a prospective Homex customer, that the Homex concept of housing construction was not opposed by organized labor. The coziness of the Homex-UBCJA relationship went considerably further than mere collaboration, however. The record shows that the 1971 registration statement and other reports were materially false and misleading in that they failed to disclose that Homex officials had arranged for the sale of approximately $240,000 worth of Homex common stock to seven officials and members of the UBCJA at approximately $80,000 less than the stock's market value. In addition, when the market value fell, Homex arranged for the purchase from those same union officials and members of approximately $64,000 worth of Homex common stock at approximately $136,000 above the fair market value.
 
 
 55
 On October 1, 1969, Homex filed its registration statement in connection with the issuance of the 1,175,000 common shares. The prospectus made the following observation on Homex's labor relations:
 
 
 56
 (T)he modules are manufactured and dwellings are erected completely by building trades union labor. The Company has had no strikes or interference with its production or on-site erection of its dwelling units.
 
 
 57
 Freedom from work interruptions as a result of labor problems is important to the continued success of the Company's business. Although the Company believes the above-mentioned agreements should contribute to the continuation of its present satisfactory labor relations, it can give no assurance that the Company and its subsidiaries will be free of labor problems in the future.
 
 
 58
 During the following months, conversations regarding the possible purchase by various UBCJA officials and members of soon-to-be publicly offered Homex stock were pursued. On January 6, 1970, Yanowitch asked the Homex legal department to consider the legality[11] of designating union officials as eligible to purchase Homex stock at the $16.50 issue price.[12] The department did not find such designation unlawful, but it did advise that the arrangement would, if made public, be bad for Homex's image. Despite this advice, and in anticipation of the February 19, 1970, offering, Homex submitted to Pressprich a list of several hundred names as "issuer-designated subscribers," including the names of seven UBCJA officials. Kenneth Langone, President of Pressprich, questioned the propriety of designating labor union representatives as subscribers, arguing that they were people with whom Homex was supposed to have an arm's length relationship. As a result, the names were taken off the list.
 
 
 59
 On February 19, 1970, the Homex registration became effective, and 1,175,000 shares were sold at $16.50. Within minutes, Homex shares were being traded at $34 per share; one month later the price was up to $52 a share. David Stirling then contacted Langone and argued that the union officials should have received the stock as had been discussed. Langone, having overcome his earlier reservations, proposed backdating sales to the union representatives to the $34 per share after-market purchase price. Stirling agreed to this arrangement and instructed Charles Marshall, then his banker at the Central Trust Company in Rochester, to loan the purchase price of the stock to the union officials. Stirling guaranteed repayment of the loan under his personal line of credit, though at trial he claimed the guarantee was a forgery. In sum, on March 20, 1970, seven UBCJA officials "purchased," effective February 19, 1970, and aided by a loan arranged and guaranteed by Stirling, approximately $240,000 worth of Homex stock for approximately $160,000.
 
 
 60
 On January 8, 1971, Homex's annual report and proxy statement were mailed. The annual report contained the following comment on Homex labor relations:
 
 
 61
 Stirling Homex is pleased to have been the first modular housing manufacturer to sign a national labor contract with the United Brotherhood of Carpenters and Joiners of America (AFL-CIO) for both in plant production and on-site installation.
 
 
 62
 A few days earlier, Homex's chauffeur, William McCann, acting on Yanowitch's instructions, cashed six Homex checks for $11,500. These checks were payable to cash, and had been issued on the basis of false travel and entertainment expense vouchers. The money was used to pay the interest due on the Central Trust Company loan to the union officials. There was no mention of this in the annual report or proxy statement.
 
 
 63
 Finally, in November, 1971, Homex went even further to foster its "precedent-setting" labor relations. By then, Homex stock had begun to fluctuate between $15.00 and $18.00 per share. William and David Stirling, along with Yanowitch, arranged for the repurchase of the union officials' stock at $34.00 per share, the amount for which the stock had been originally "purchased." We note that the labor contract with Homex expired at the end of September, 1971, and a new three-year contract was successfully negotiated.
 
 Kece, Reseac and Route 57-31 Revisited
 
 64
 The original 1971 registration statement included the following representation regarding the Kece, Reseac and Route 57-31 land transactions:
 
 
 65
 During the fiscal year ended July 31, 1969, the Company sold two parcels of undeveloped land (Kece and Reseac) and during the seven months ended February 28, 1971 it sold one parcel (Route 57-31). Trade sales included $750,000 for the year ended July 31, 1969 and $1,822,723 for the seven months ended February 28, 1971 in respect of these sales, which resulted in net income for the respective periods of about $187,000 (18% Of the total net income) and $556,000 (35% Of the total net income). All the sales of undeveloped land provided for deferred payment of part of the purchase price.
 
 
 66
 In addition, under "Notes to Consolidated Financial Statements," the registration statement described in some detail the Kece, Reseac and Route 57-31 arrangements as "Long-Term Receivables."
 
 
 67
 The descriptions in the Notes had been brought about by pressure on Homex from HKF to disclose the nature of the transactions more accurately. In turn, these descriptions prompted the SEC to inquire into the arrangement and, eventually, to require an even more detailed disclosure regarding the Route 57-31 arrangement. Despite various intentional misrepresentations by Homex, the SEC ultimately prohibited inclusion of the $2,100,000 Route 57-31 "sale" as income. The registration statement as finally amended and filed left the Kece and Reseac representations the same, but reported the Route 57-31 transaction under "Inventories" as follows:
 
 
 68
 The Company has entered into a contract to sell a parcel of land with costs of $673,017 for a price of $2,100,000. The Company has received a down payment of $210,000 which has been accounted for as an option deposit.
 
 
 69
 Thus, Homex was finally forced to acknowledge that land transactions of the sort it was engaged in were not honestly characterizable as sales and income but rather as contracts for possible subsequent sale in other words, option contracts.
 
 Accounting Practices Revisited
 
 70
 Both the draft and final 1971 registration statements represented that Homex recognized the sale of modules "when the units are manufactured and assigned to specific contracts." This prompted the SEC to inquire whether income was being recognized "too far in advance of the date of billing to customers." Homex, through Schulz, responded by letter with the following information:When the following conditions have been met, the Company records as sales and charges costs with the related costs of modules manufactured.
 
 
 71
 1. The Company must be designated by the local housing authority, non-profit sponsor or other agencies as the contractor for the project. This designation is supported by a formal commitment from the customer to the Company.
 
 
 72
 2. The customer must have obtained and submitted evidence to the Company that a commitment of monies to fund the project has been obtained from the appropriate governmental agency under which the project has sponsorship.
 
 
 73
 3. The numbers and types of modules and the general site plan and improvements must be identified and be the subject of the agreement between the Company and its customers.
 
 
 74
 4. The Company must assign the manufactured module to a specific project and physically identify the module as being assigned to and reserved exclusively for that specific project and customer. (At the present time this identification is physically attached at the earliest stage of the manufacture of the module.)
 
 
 75
 5. The module must be completed and be ready for shipment to the customer.
 
 
 76
 When all these events have occurred, and only when all these events have occurred, does the Company recognize income.
 
 
 77
 (emphasis added).
 
 
 78
 Clearly, "all these events" had not "occurred" with regard to the Southbridge, Massachusetts, and Clay, New York, projects. Similarly, they had not occurred with regard to the Mississippi project. The Mickey Mouse file hardly substantiates Homex's claim that it relied solely upon the existence of these events for income reporting. In fact, large scale reassignment of modules to various contracts seems to have taken place whenever it met Homex's needs. Had this practice been disclosed, it would have been clear to Peat Marwick that, as one of its auditors testified at trial,
 
 
 79
 Homex was not producing to a specific customer order and exclusively reserving modules for contracts, but rather manufacturing for inventory and therefore instead of having those units in sales, those units would have been in inventory, which would have had a significant effect on the income recognition and the portrayal of the balance sheet.
 
 
 80
 The 1971 Annual Report.
 
 
 81
 On October 8, 1971, Homex mailed its Annual Report to stockholders. As might be expected, it mentioned very little of the story just told.
 
 
 82
 III. BANKRUPTCY: THE SCHEME COLLAPSES.
 
 
 83
 On July 12, 1972, the house of cards collapsed. Less than one year after the sale of Homex preferred stock to the investing public, and approximately two years after the sale of Homex common stock, sales that totaled $39 million, Homex filed a petition for reorganization under Chapter X of the Bankruptcy Act. This was immediately preceded by the posting of large losses for the early parts of the 1971-1972 fiscal year and the resignations of David and William Stirling, Yanowitch, Schulz and Phillips.
 
 
 84
 IV. APPELLANTS' LEGAL CLAIMS.
 
 
 85
 We now turn to the various legal arguments advanced by the individual appellants.
 
 
 86
 The Scope of the Indictment and the Sufficiency of the Evidence.
 
 
 87
 David Stirling, Yanowitch and Schulz argue that the district court committed reversible error by refusing to withdraw from the jury's consideration various specific allegations in the indictment as to which, they claim, there was insufficient evidence.[13] They rely on this Court's decision in United States v. Natelli, 527 F.2d 311 (2d Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Their argument is that the failure to withdraw the allegedly unsupported allegations rendered the jury verdict fatally ambiguous. We disagree. Their argument depends upon an incorrect understanding of the law and their claims of insufficient evidence are not well taken.
 
 
 88
 In United States v. Natelli, supra, this Court considered an appeal by certified public accountants from convictions for making materially false representations in proxy statements filed with the SEC. They had been convicted under a one-count indictment that alleged two separate and distinct criminal episodes. A single, unifying scheme to defraud was not alleged; nor was there an allegation of a conspiracy. The district court had instructed the jury that a finding of guilt under either specification was sufficient to support a conviction; the jury found both defendants guilty. With regard to one of the defendants, however, the Court of Appeals held that there was sufficient evidence for conviction based on only one of the specifications. The Court explained:
 
 
 89
 A difficulty does arise . . . if it is found as matter of law that there should have been a directed verdict for a defendant on one of the specifications for insufficiency of evidence. The verdict then becomes ambiguous, for the jury could have rejected the specification which the appellate court holds sufficiently proved, and have convicted only on the specification held to be insufficiently proved. In that event, there seems to be no alternative to remand for a new trial. That is the general principle.
 
 
 90
 527 F.2d at 325. The Court noted further that "(w)hen there is more than one specification as a predicate for guilt, each dependent on particular evidence which is unrelated to the other, it would be sound practice to instruct the jury that they must be unanimous on a particular specification to convict." Id.
 
 
 91
 In contrast, this case presents a different situation, one more closely akin to that considered in this Court's decision of United States v. Amrep Corp., 560 F.2d 539 (2d Cir.), cert. denied, --- U.S. ----, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978). There the Court reviewed a conviction of twenty counts of mail fraud and five counts of interstate land sale fraud. The Amrep appellants argued, as appellants do here, that, in proving a scheme to defraud by several misrepresentations, the government must prove every misrepresentation charged in the indictment. They argued further that the government's failure to meet this burden required a retrial. In rejecting this argument, the Court made the following observation:
 
 
 92
 "(Appellants) confuse the scheme to defraud, which is the gist of the offense, with the means adopted to effectuate the scheme." A scheme to defraud may consist of numerous elements, no particular one of which need be proved if there is sufficient overall proof that the scheme exists. Appellants' reliance on United States v. Natelli is misplaced. In that case, the defendant was charged in a single count with violating the securities laws by making false statements in a proxy statement. Because the crime charged consisted of the making of such statements, the erroneous failure of the trial court to direct a verdict as to one of the alleged falsities, arising out of a separate state of facts, made the jury's verdict ambiguous and required a new trial. Here, the crime charged was the scheme to defraud, and the alleged false statements were merely means for carrying it into effect.
 
 
 93
 560 F.2d at 546-47 (citations omitted; emphasis added). This is precisely the situation here. In addition, the Homex indictment charged a conspiracy which, under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), makes each conspirator substantively liable for the foreseeable acts of his co-conspirators committed in the furtherance of the conspiracy. Finally, even if this were a Natelli rather than Amrep type case, the jury instruction given by the district court was precisely the type of instruction suggested by the Natelli Court.
 
 
 94
 The real question, then, is not so much whether there was sufficient evidence regarding each and every specification but, rather, whether there was sufficient overall proof of the alleged scheme to defraud and conspiracy. Viewing the evidence in the light most favorable to the government, United States v. Glasser, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and " 'giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact,' " United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972), quoting, Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), we have no doubt that there was sufficient evidence to convict the appellants of the substantive crimes. In addition, with regard to the sufficiency of evidence for the conspiracy convictions, our deliberations are governed by the following principles:
 
 
 95
 "(T)he gist of the offense (of conspiracy) remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." In making this determination, courts often look to knowledge and dependency as evidence of an agreement. These factors, in turn, may be inferred from an assessment of the nature of the criminal enterprise and the defendants role in it . . . . For such an inference to be drawn, however, it is necessary to examine "the qualitative nature of the act or acts (of each defendant) . . . in the context of the entire conspiracy . . . ."
 
 
 96
 United States v. Taylor, 562 F.2d 1345, 1352 (2d Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977) (citations omitted).
 
 
 97
 As the recitation of the facts above makes clear, there is no doubt regarding the existence of the alleged conspiracy. Each appellant played a central role in some if not all of the various elements of the common scheme and in the overall maintenance of its life. The purpose of the scheme was apparent; the responsibility for the scheme is also apparent. Collectively, the appellants did their best to take advantage of the plan and to keep it alive. Quite properly, they now share the consequences.
 
 
 98
 David Stirling was a central and motivating force in the Homex frauds and conspiracy. Apart from his involvement in and supervision of virtually every aspect of Homex operations, he was shown to be directly and significantly involved in the various land transactions and in the various representations regarding recognition of income. He was the key figure in the Reseac affair: he helped conceive the idea, he participated in making the side promises, he observed the deterioration of the transaction, and he did all he could to keep it alive so that Homex could continue to recognize income from it. He did this with full awareness of the SEC standards regarding the reporting of income from land transactions. See note 10 supra. In addition, he told the SEC, the Homex auditors and the investing public that income was recognized only when specific modules were assigned to specific contracts, knowing full well the reassignment practices and policies of the accounting division. Finally, he knew about and participated in the adjustment of Homex accounts by delaying the entry of cost overruns in the installation department, reporting as income the Greater Gulf-U.S. Shelter transaction, and attempting to capitalize the $832,000. This is by no means an exhaustive description of what David Stirling could permissibly be found to have done during his association with Homex, but it certainly constitutes convincing evidence of his guilt.
 
 
 99
 The same can properly be said about Harold Yanowitch. Quite apart from his constant presence and supervision, he was shown to have been directly involved in the Kece affair. He shielded from the auditors and Dr. Mauriello the true nature of the Kece and Route 57-31 transactions, even with full knowledge of the applicable SEC standards. The jury was instructed and could have found that, where Yanowitch did not know of the specific wrongdoings, he must have "deliberately closed his eyes to what otherwise would have been obvious to him and with a conscious purpose to avoid learning the truth." Although appellant Schulz was primarily responsible for implementation of the accounting policies of Homex, Yanowitch quite clearly collaborated in the creation and furtherance of those deceptions.
 
 
 100
 Finally, Schulz' participation in the fraudulent accounting practices at Homex is clear. Although he may not have participated in the negotiation of the various land transactions, he was instrumental in the design and implementation of the accounting systems that made the extravagant claims of Homex income possible. His frequent discussions with Dr. Mauriello, the Homex auditors and the SEC, and the misrepresentations he made to them, were essential to the maintenance of the Homex fraud.
 
 
 101
 Paragraph 16.
 
 
 102
 The Stirlings and Yanowitch argue that the district court committed reversible error by denying their pre-trial motions to strike Paragraph 16 of the indictment.[14] That paragraph is based on the appellants' failure to disclose in the second registration statement the true nature of Homex's relationship with union officials. They advance three separate bases in support of their argument: the privilege against self-incrimination; the double jeopardy clause; and the prejudice resulting from the allegedly inflammatory nature of the paragraph itself.
 
 
 103
 Self-Incrimination.
 
 
 104
 The self-incrimination claim is essentially this: if appellants had disclosed to the SEC and the public the true nature of the stock transactions with the UBCJA officials, they would have been admitting facts sufficient to form the basis for a criminal prosecution under the Taft-Hartley Act, 29 U.S.C. § 186. Because of this, the argument goes, the Fifth Amendment must operate to protect them from prosecution for failing to make the disclosure in the first place. Appellants rely on Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). Their argument, if accepted, would lead to the conclusion that securities misrepresentations would be constitutionally protected if the true but undisclosed facts would lead to criminal prosecution.
 
 
 105
 In California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), the Supreme Court noted that when "confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one." 402 U.S. at 427, 91 S.Ct. at 1537. It noted further that:
 
 
 106
 Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.
 
 
 107
 Id. The Court upheld as constitutional a California "hit and run" statute that required the driver of a motor vehicle in an accident to stop at the scene and give his or her name and address. The Court held that compliance with an essentially regulatory statute, where (1) self-reporting is essential to the fulfillment of its objective, (2) the burden is placed upon the general public rather than a "highly selective group inherently suspect of criminal activities," (3) the general activity is lawful and (4) the possibility of incrimination is not substantial, does not violate the Fifth Amendment privilege against self-incrimination. 402 U.S. at 427-31, 91 S.Ct. 1535, 1539. See also Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).
 
 
 108
 Significantly, the Byers Court cited a number of examples of disclosure requirements in the commercial and industrial sectors and made the following observation:
 
 
 109
 In each of these situations there is some possibility of prosecution often a very real one for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.
 
 
 110
 402 U.S. at 427-28, 91 S.Ct. at 1538. See Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). The same reasoning applies here.
 
 
 111
 This Court has considered a problem similar to the one presented here in S.E.C. v. Radio Hill Mines Co., 479 F.2d 4 (2d Cir. 1973). There, as here, the appellant had been charged with orchestrating an elaborate scheme which violated the registration and antifraud provisions of the securities laws. In upholding the validity of a preliminary injunction that required disclosure of securities transactions, the Court found it "clear that securities regulation is an 'essentially noncriminal and regulatory area of inquiry.' " 479 F.2d at 7. The Court also determined that the information that was required to be disclosed related to what was "generally a completely 'lawful activity,' " quoting California v. Byers, supra, 402 U.S. at 431, 91 S.Ct. at 1539, and that the disclosure was not an admission of an "inherently suspect" activity, citing Albertson v. Subversive Activities Control Board, supra, 382 U.S. at 79, 86 S.Ct. 194. We think the same is true for this case. We have no doubt that the securities laws are "essentially noncriminal and regulatory" and that self-reporting is essential to the fulfillment of the central purpose of the statutory scheme. Nor do we believe the people and enterprises making up the commercial and investment sectors of our economy are a "highly selective group inherently suspect of criminal activities." In addition, the sale of stock and the maintenance of peaceful labor relations are quite obviously, and quite necessarily, lawful activities. Appellants chose to engage in a lawful activity in an unlawful manner. That unlawfulness cannot now be used to excuse them from regulatory disclosure requirements, even though such disclosures could lead to criminal prosecution under other statutory schemes.
 
 
 112
 The Double Jeopardy Claim.
 
 
 113
 David Stirling and Yanowitch were indicted in the Western District of New York for violations of the Taft-Hartley Act, 29 U.S.C. § 186(a)(1). Stirling pleaded guilty and Yanowitch pleaded nolo contendere.[15] They argue here that prosecution under Paragraph 16 of the indictment is barred by the double jeopardy clause of the Fifth Amendment because it depends upon the same facts underlying the Taft-Hartley prosecution. The district court properly rejected this argument.
 
 
 114
 Even if the indictment in the Western District and the indictment in the Southern District were the same "in fact," they certainly are not the same "in law." The conduct of Stirling and Yanowitch provided the basis for two separate and distinct prosecutions based upon two separate and distinct statutory schemes. The double jeopardy clause was not meant to prevent such multiple but entirely distinct prosecutions. See United States v. Armedo-Sarmiento, 545 F.2d 785, 792 (2d Cir. 1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977); United States v. Cala, 521 F.2d 605, 607 (2d Cir. 1975); United States v. McCall, 489 F.2d 359, 362 (2d Cir. 1973), cert. denied, 419 U.S. 849, 95 S.Ct. 88, 42 L.Ed.2d 79 (1974); United States v. Sebastian, 428 F.Supp. 967, 970-72 (W.D.N.Y.1977).
 
 
 115
 The "Inflammatory and Prejudicial Nature" of Paragraph 16.
 
 
 116
 The Stirlings and Yanowitch argue that Paragraph 16 of the indictment should have been stricken by the district court prior to trial as being of an inflammatory and unfairly prejudicial nature and, during and after trial, for failure of proof. We reject both arguments.
 
 
 117
 Paragraph 16 of the indictment originally charged that the defendants knew but did not disclose that UBCJA officials "had been paid off by having" Homex stock purchased for them at a low price and bought back from them at a high price. Prior to trial, the Stirlings and Yanowitch moved to strike the entire paragraph under Fed.R.Crim.P. 7(d). The district court ordered the deletion of the "paid off" language; only the modified version was seen by the jury. We think this decision by the district judge was sound, and we see no reason why he should have gone farther and deleted the entire paragraph. The redacted paragraph was a rather bland statement of allegations regarding the failure to disclose the true nature of the relationship between Homex and UBCJA officials. See Fed.R.Crim.P. 7(c). This allegation was made in a noninflammatory fashion and it was properly included in an indictment for violation of securities laws and the mail fraud statutes.
 
 
 118
 The true nature of Homex's labor relations was important to a potential investor. Once Homex decided to make representations concerning its labor relations, it should have described them accurately. Corporate funds were being used improperly to aid in the maintenance of peaceful labor relations, a fact that investors did not know. Knowledge of the true machinations would have given a prudent investor considerable pause labor relations would not have looked as normal as they were made to appear nor would the corporate financial practices have appeared so sound.
 
 
 119
 The purpose of an indictment is to state the charge against the accused. The accomplishment of that purpose is to some extent inherently prejudicial. On the facts before us, however, we conclude that the district court did not abuse its discretion by deciding that the indictment was not unfairly prejudicial. See United States v. Courtney, 257 F.2d 944, 947 (2d Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 316, 3 L.Ed.2d 303 (1959).
 
 
 120
 Appellants also suggest that the district court erred by not striking Paragraph 16 sua sponte, either during or after trial. They claim that the facts necessary to support Paragraph 16 could not have been and were not shown. We disagree. The charge was properly included in the indictment in the first place, and at trial the government presented substantial evidence to support it. See United States v. Stanchich, 550 F.2d 1294, 1299 (2d Cir. 1977); United States v. Taylor, 464 F.2d 240, 242-45 (2d Cir. 1972).Rule 11(e)(6).
 
 
 121
 Appellant Schulz was interviewed nine times at the United States Attorney's Office during the early stages of the Homex investigation. At first, he maintained that there were no grounds for an indictment. He was unpersuasive. In March, 1976, Assistant United States Attorney MacDonald informed Schulz that an indictment was going to be recommended. Schulz was not pleased with this news, and he asked his attorney to meet with MacDonald. They met, and MacDonald suggested that Schulz plead guilty and testify for the government.
 
 
 122
 Schulz agreed to a negotiated plea agreement on July 15.[16] On July 16 he testified before the Grand Jury, giving detailed and incriminating information regarding the activities he and his Homex colleagues had engaged in. Neither a copy of the indictment nor a commitment as to what it would contain was given to Schulz until after his Grand Jury appearance. When the indictment was finally filed on July 27, Schulz was apparently shocked that it charged him with the same nine counts as the other defendants. Apparently because of the scope of the indictment and because the indictment did not charge the Homex auditors, Schulz withdrew from the plea agreement, pleaded not guilty and went to trial. His Grand Jury testimony was admitted as evidence against him.
 
 
 123
 Schulz claims on appeal, as he did below, that his Grand Jury testimony was made "in connection with" his offer to plead guilty and therefore, under Fed.R.Crim.P. 11(e)(6),[17] should not have been allowed as evidence. Judge Frankel denied Schulz' pre-trial motion, finding that his "argument strains the language and purport of the Rule (and) has no basis in policy or significant precedent." In rejecting Schulz' motion made during trial, Judge Frankel added that Schulz had lost the protection of the plea agreement by failing to plead guilty and that his suggested interpretation of the rule would work "evil consequences" by subjecting the Grand Jury and investigative processes "to all kinds of deceptive and manipulating and misleading uses." We agree.
 
 
 124
 Rule 11(e)(6) has not been applied to Grand Jury testimony given after formalization of a negotiated plea agreement and before withdrawal from that agreement.[18] Nor will we so apply it here. See generally 2 Weinstein's Evidence 410-1 to 410-42 (1976) (discussion of the legislative history of Rule 11(e)(6) and related authorities). The policy behind the rule is that, "for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." United States v. Herman, 544 F.2d 791, 796 (5th Cir. 1977); United States v. Ross, 493 F.2d 771, 775 (5th Cir. 1974); Advisory Committee Note to Fed.R.Evid. 410, reprinted in 56 F.R.D. 229 (1972). Although it is true that the language of the rule is capable of being read expansively, so as to reach Grand Jury testimony given after the plea bargain, it is just as true that "the primary concern of the draftsmen . . . was with fairly formal plea bargaining between the United States Attorney and counsel for defendant after charges had been, or were about to be, made." 2 Weinstein's Evidence P 410(07), at 410-40 (emphasis added). The plea negotiation procedure between MacDonald and Schulz' attorneys was both fair and formal. We have no doubt that Schulz gave his testimony voluntarily, albeit because of the agreement. Thus, the rule was not meant to reach Grand Jury testimony in circumstances such as these, and we will not so extend it.[19]
 
 
 125
 Even the Court that has given the rule its most generous interpretation, the Eighth Circuit in United States v. Herman, supra, would not likely immunize Schulz' statements in these circumstances. In Herman, the Court held that "(s)tatements are inadmissible if made at any point during a discussion in which the defendant seeks to obtain concessions from the government in return for a plea." 544 F.2d at 797. It simply cannot be said that Schulz was engaged in a "discussion" with the Grand Jury in an attempt to obtain concessions from the government in exchange for his plea. Schulz himself concedes as much on appeal: "He was under no illusion that his testimony might persuade the grand jury not to indict him." Brief for Appellant Schulz at 34. The plea agreement had already been reached by the time Schulz went before the Grand Jury. The negotiations were over. All Schulz had to do was live up to his end of the bargain. His failure to do so justly exposed him to prosecutorial use of his Grand Jury testimony.
 
 
 126
 We believe this is precisely the result contemplated by the parties. The agreement provided as follows:
 
 
 127
 (S)hould it be judged by (the United States Attorney's) office that Mr. Schulz has . . . violated any provision of this agreement, this agreement shall be null and void and Mr. Schulz shall thereafter be subject to prosecution for any federal criminal violation . . . . Any such prosecutions may be premised upon any information provided by Mr. Schulz, and such information may be used against him.
 
 
 128
 This language is hardly ambiguous. We agree with the district court that Schulz agreed to plead guilty in exchange for the protections contained in the agreement. We also think it apparent that the agreement contemplated prosecutorial use of the information provided by Schulz in the event that the guilty plea was not entered.
 
 
 129
 It may be true that Schulz would not have testified before the Grand Jury had it not been for the plea agreement, but this is not in itself sufficient for suppression of that testimony under Rule 11(e)(6). Schulz voluntarily negotiated his plea agreement, voluntarily appeared before the Grand Jury, and voluntarily decided to violate his plea agreement. He could have relied on the agreement to protect himself. See Santobello v. New York,404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); United States v. Scharf,551 F.2d 1124, 1126 n. 4 (8th Cir.), cert. denied, --- U.S. ----, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977) ("There is no question that a breach of a plea bargain by the government, if established, may entitle a defendant who has pleaded guilty in reliance on the bargain to appropriate relief."). His breach of the agreement removed that protection. Such a result can hardly be said to undercut the confidence and candor needed for successful and fair plea negotiations. It simply means that once the agreement is finalized its terms will be enforced.
 
 
 130
 Severance.
 
 
 131
 Appellant Phillips, the central figure in the Mississippi Greater Gulf scheme, argues that the district court erred by refusing to grant his mid-trial Rule 14 motion to sever his trial from that of the other defendants.[20] Essentially, he claims that the indictment charged, and the evidence showed, multiple conspiracies rather than a single conspiracy; that he was, at most, involved in only one of those conspiracies; and that the forced combination of his trial with that of the others operated to his substantial prejudice. We disagree.
 
 
 132
 First, we reject Phillips' argument that the indictment charged, and the evidence showed, multiple conspiracies. The indictment charged a single conspiracy, the "essential nature" of which was the fraudulent inflation of Homex's reported income and the intentional concealment of material information adverse to Homex. Compare United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977). That the indictment alleged a variety of devices intended to accomplish this objective, devices carried out by a variety of individuals, does not alter the fundamental nature of the indictment itself. Thus, the question is whether the government established the existence of the alleged conspiracy. This is a matter "primarily for the jury, since it is a question of fact as to the nature of the agreement." United States v. Finkelstein, 526 F.2d 517, 522 (2d Cir. 1975), cert. denied, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); United States v. Armedo-Sarmiento, 545 F.2d 785, 789 (2d Cir. 1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977). "Our task on review is to determine whether the legal standard given to the jury by the trial court in its charge was correct and whether, viewing the proof in the light most favorable to the Government, there was sufficient evidence to permit the jury to find the single conspiracy alleged." United States v. Taylor, 562 F.2d 1345, 1351 (2d Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). Here, Phillips did not even request a jury instruction on the difference between single and multiple conspiracies, nor did he object to the charge that was eventually given. Moreover, the charge that was delivered was a fair one it made clear that guilt was to be found on an individual basis and it focused on the fact that Phillips was not named in various specifications of the indictment. Given this, and given the overwhelming mass of evidence establishing the existence of a broad conspiracy aimed at accomplishing an unlawful objective, we cannot agree that there were multiple conspiracies or that Phillips was entitled to severance on that basis.
 
 
 133
 Thus, the real question is not whether there was a misjoinder under the liberal provisions of Fed.R.Crim.P. 8,[21] but whether the refusal of the district court to sever Phillips from the main trial was so unfairly prejudicial under Rule 14 as to constitute an abuse of discretion. This is a difficult burden for Phillips to meet. "The determination of the elusive criterion of prejudice rests in judicial discretion at the trial level, and is virtually unreviewable." 8 Moore's Federal Practice P 14.02(1), at 14-3 (2d ed. 1977) (footnote omitted). While we do not shirk our responsibility of review, we are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice. United States v. Miley, 513 F.2d 1191, 1209 (2d Cir.), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975). It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial. United States v. Corr, 543 F.2d 1042, 1052 (2d Cir. 1976); 8 Moore's Federal Practice P 14.04(1), at 14-14.2 to 14-15 (2d ed. 1977).
 
 
 134
 Phillips was charged with playing a significant and knowing role in the advancement of the objective of the conspiracy. Although he was not charged with having participated in every detail of that conspiracy, we have no doubt that he was properly tried with the other conspirators. He played the key role in orchestrating the most blatant misrepresentation in the entire Homex drama, the Greater Gulf project. The public interest in avoiding unnecessarily multiplicious litigation was well-served by the district court's decision. We hold that Phillips was not prejudiced by the denial of the motion, nor was its denial an abuse of discretion.
 
 
 135
 William Stirling's Motion for Acquittal.
 
 
 136
 William Stirling argues that the district court erred by denying his Rule 29 motion for judgment of acquittal. He claims that the evidence showed no more than that he was "the head of production at Homex, a craftsman whose talent ran to assembling prefabricated homes with cranes, rather than the alleged fabricating of financial statements" and that "all his alleged activities were more likely the result of brotherly trust than a desire to defraud." He characterizes the evidence against him as "paltry." The district court believed that this argument was non-frivolous but determined that a jury question existed. We agree.
 
 
 137
 A motion for judgment of acquittal is governed by Fed.R.Crim.P. 29, which provides that a judgment of acquittal shall be entered "if the evidence is insufficient to sustain a conviction." See generally 8A Moore's Federal Practice PP 29.01 to 29.09 (2d ed. 1977). The question, therefore, is whether the evidence was sufficient. See Id. P 29.06. We determine this by asking
 
 
 138
 whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.
 
 
 139
 United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972), quoting, Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). In Curley, the District of Columbia Circuit said that if the district court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, (it) must let the jury decide the matter." 81 U.S.App.D.C. at 393, 160 F.2d at 233. This, coupled with the requirement that we view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), leaves us with no doubt that the district court was correct.
 
 
 140
 William Stirling was founder, President, Chief Operating Officer and Director of Homex. His participation in the creation and management of Homex was constant and comprehensive. Without going through the entire Homex story again, we need only say that there was ample evidence to warrant submitting to the jury the question whether William Stirling was an active and knowing participant in the fraud schemes and conspiracy. See United States v. Amrep Corp., supra.
 
 
 141
 The Prosecutor's Summation.
 
 
 142
 William Stirling argues that he should be granted a new trial based upon allegedly prejudicial comments made by the prosecutor during rebuttal summation. He claims that the prosecutor misstated the testimony of two witnesses and improperly raised the matter of his use of Homex expense accounts. The district court went out of its way to compliment all of the attorneys on their summations. Appellant Stirling found no fault with the rebuttal summation when it was given. We agree with the district court's evaluation. In our view, nothing in the prosecutor's comments constitutes plain error. Fed.R.Crim.P. 52(b); see United States v. Canniff, 521 F.2d 565, 572 (2d Cir. 1975), cert. denied, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); United States v. Perez, 426 F.2d 1073, 1081 (2d Cir. 1970), aff'd, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).
 
 
 143
 Miscellany.
 
 
 144
 The Stirlings and Yanowitch make five additional arguments that we now consider briefly. First, they argue that the district court committed reversible error by telling the jury that it might have heard perjury during the trial and that it should consider the interests of the witnesses in evaluating testimony. They argue that this remark was directed to their testimony.
 
 
 145
 Specifically, they claim that the following portions of the jury instruction constitute error:
 
 
 146
 Now to go to . . . the subject of credibility of witnesses. That is a key problem for juries. I think it is reasonably safe to suggest that you probably heard more than once perjury from the witness stand in this case. Beyond that, of course, you have heard lots of conflicting statements about what happened or didn't happen, about what was said or was not said, and you are relying on the net effect of those witnesses in the last analysis for your discovery of the truth, for your accurate recreation of the events upon which you will base an accurate and just decision, and that is the problem of credibility.
 
 
 147
 Among interested people who testified you have heard three of the defendants themselves, and you would know without my saying that a defendant in a criminal case has a deep and profound and abiding interest in the outcome of that case. Obviously that is among the factors you will take into account in appraising the credibility of those witnesses.
 
 
 148
 In considering whether (cooperating witnesses) may have sworn falsely in this respect, you may also take into account that the cases at least where immunity has been granted, the immunity has been conditioned on the undertaking of the witness to tell only the truth here and elsewhere with the stipulation that the immunity would end if the person was deemed to testify falsely, and you may weigh that with and against the several other things that I have mentioned.
 
 
 149
 The district court prefaced its instruction with the remark that it had no view on the issues and that its instructions were not to be used as indicators of its opinion. Because no objections to the charge were made by the appellants, they are barred from raising them now. Fed.R.Crim.P. 30; United States v. Nathan, 536 F.2d 988, 992 (2d Cir.), cert. denied, 429 U.S. 930, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976). Even if objection had been made, the instruction was fair and proper. See United States v. Cheung Kin Ping, 555 F.2d 1069, 1074 (2d Cir. 1977); United States v. Floyd, 555 F.2d 45, 47 (2d Cir. 1977); United States v. Lombardi, 550 F.2d 827, 829 (2d Cir. 1977); United States v. Tolkow, 532 F.2d 853, 859 (2d Cir. 1976). It was certainly not plain error. Fed.R.Crim.P. 52(b).
 
 
 150
 Second, they argue that the charge given by the district court regarding reliance on experts was erroneous. The court charged as follows:
 
 
 151
 If an attorney or an accountant has a full account of the facts of what you are doing and what you intend to do and then says it is proper, it is lawful, your proceeding on that basis might serve as a strong indication that you were acting in good faith and not in bad faith.
 
 
 152
 On the other hand, you will realize that if some of the important facts are mis-stated to the accountant or lawyer or if some of the important information is withheld and not disclosed, the advice that the accountant or lawyer then gives can hardly be deemed to constitute a basis for claiming good faith in going ahead and acting on the basis of that uninformed and insufficiently implemented advice.
 
 
 153
 Appellants claim they were entitled to an instruction that the failure of Homex attorneys, auditors and labor experts to ask them sufficiently probing questions releases them from responsibility for whatever omissions and false statements they made after consulting with those experts. Such an instruction would stand the defense of good faith on its head. The appellants' experts had no obligation to ferret out proof of wrongdoing. If they were not fully informed, their lack of information can hardly be used as a defense by those who chose to keep them uninformed. United States v. Tolkow, supra, 532 F.2d at 857; United States v. Smith, 523 F.2d 771, 778 (5th Cir. 1975), cert. denied, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976).
 
 
 154
 Third, they argue that they were prejudiced by the district court's decision to bar questions put by them to their witnesses regarding the " normalcy" or "usualness" of certain Greater Gulf practices. The district court instructed counsel not to ask witnesses about "the legal consequences of things," such as whether activities were "wrong," "misleading," "proper," or " ethical." For example, in response to a question from counsel for the appellants, a state court judge from Mississippi testified that because prominent people with good reputations were involved in Greater Gulf, he assumed that it was "normal" for a non-profit corporation to be used to implement the project. Such testimony is not even arguably admissible. It would have been an abdication of responsibility if the trial judge had not interrupted, as he did, to instruct counsel not to ask such questions. The "normalcy" of Greater Gulf practices was irrelevant to the failure to disclose Homex's relationship with Greater Gulf. Even if it were relevant, the witness' speculations, based on the reputations of those involved, would not be probative on that issue. Fed.R.Evid. 404. And even if it were probative, such evidence should not have been sought to be introduced through a sitting judge. Its potential for unfair prejudice to the government quite plainly outweighs its negligible probative value. Fed.R.Evid. 403. Finally, although counsel insisted on making unnecessary "exceptions" to the district court's instructions, he completely failed to make an offer of proof as required by Fed.R.Evid. 103(a)(2). The context in which the rulings were made does not disclose the substance of any evidence aside from the inadmissible "normalcy" evidence that was admitted in any event that counsel wished to bring out. Counsel's explanation of his purpose was, at best, confusing, and in view of the answer he had just obtained, it was hardly a sufficient basis upon which to predicate a claim of error.
 
 
 155
 Fourth, they argue that the district court erred by excluding Daniel Wind as a defense witness. They claim Wind would have disclosed that, on the eve of the Homex bankruptcy, he was negotiating with Homex on behalf of the State of Israel for a purchase of modules. This testimony apparently would have been used to respond to evidence proffered by the prosecution tending to show that there were at the time of bankruptcy "few if any viable projects in the works." We reject appellants' claims. That negotiations were taking place at the very close of the Homex drama was irrelevant negotiations were apparently always taking place. The point of the Homex prosecution was not to deny the existence of negotiations, even successful ones, but to show that the investing public had been defrauded. The jury was carefully reminded of the fact that Homex had indeed made genuine sales.
 
 
 156
 Finally, they argue that the district court erred in excluding one Peter Turzik, a former UBCJA official, as a surrebuttal witness. They claim that Turzik would have testified that a prosecution rebuttal witness, Theodore Kheel, had lied when he denied having arranged for the purchase of Homex stock by UBCJA officials. Appellants had a reasonable chance to challenge Kheel's testimony regarding Turzik by confronting him with seemingly contradictory grand jury testimony. In addition, the district court at the same time allowed Joseph Kirkland, one of the labor officials who purchased Homex stock, to testify in surrebuttal to much the same effect that Turzik would have. Further evidence would have been cumulative. We can hardly say that the district court abused its discretion in this regard. See Fed.R.Evid. 403. Nor can we say that the district court's decision operated to appellants' substantial prejudice.
 
 V. CONCLUSION
 
 157
 The motion to dismiss the appeal and remand to the district court is denied. See note 15 supra. Judgments of conviction are affirmed.
 
 LUMBARD, Circuit Judge (concurring):
 
 158
 I concur in the affirmance of all the convictions, substantially for the reasons stated in Judge Meskill's opinion. In addition, I wish to state my views regarding Schulz's complaint about the government's use at trial of his grand jury testimony.
 
 
 159
 Schulz seeks reversal of his conviction on the ground that it was error for the district court to submit into evidence testimony Schulz had given to the grand jury prior to his indictment. This testimony was given pursuant to an agreement that Schulz, acting through his attorney, had entered into with the prosecutor, under the terms of which Schulz was to plead guilty and testify for the government both before the grand jury and at trial. In addition, the agreement specifically provided, as Judge Frankel found, that if Schulz failed to perform as promised, then any information he had given could be used against him.
 
 
 160
 In denying Schulz's motion at trial to suppress his grand jury testimony, Judge Frankel noted that Schulz had testified, "voluntarily, for his own good, at a time when he had agreed to plead guilty to one count." Judge Frankel concluded that under these circumstances Fed.R.Crim.P. 11(e)(6) did not require suppression and that the government had never agreed to suppression under any circumstances. The record amply supports these findings.
 
 
 161
 Rule 11(e)(6) does not apply here. The written agreement entered into by the government and Schulz's attorney prior to Schulz's grand jury appearance plainly anticipated that, should Schulz renege as he did by going back on his promise to plead guilty then his testimony could be used at his trial. The purpose of Rule 11(e)(6) is to encourage plea negotiations leading to the prompt disposition of criminal charges by means other than trial. See United States v. Smith, 525 F.2d 1017, 1020 (10th Cir. 1975); 2 J. Weinstein & M. Berger, Weinstein's Evidence P 410(03) (1976). Thus, the rule has no application where a plea agreement has already been made which specifically addresses the question of subsequent use of information given pursuant to the agreement.
 
 
 162
 From the standpoint of the government, the obvious purpose of such an agreement is to enable the prosecutor to pursue his investigation and preparation for the presentation of evidence in such a way that the time and expense spent in negotiations and discussions will not be fruitless. Such safeguarding of government resources is all the more necessary because the government must comply with the increasingly stringent time schedule mandated by the Speedy Trial Act of 1974, 18 U.S.C. § 3161 to § 3174.
 
 
 163
 Of course nothing turns on whether Schulz's statements were made before a grand jury. No matter where or how made, any statements made by Schulz pursuant to the agreement could have been used by the government at his trial.
 
 
 164
 For these reasons, the district court did not err in admitting Schulz's grand jury testimony.
 
 
 
 [1]
 Section 77q(a), Title 15 U.S.C., provides as follows:
 Fraudulent interstate transactions
 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 
 
 [2]
 Section 77x, Title 15 U.S.C., provides as follows:
 Penalties
 Any person who willfully violates any of the provisions of this subchapter, or the rules and regulations promulgated by the Commission under authority thereof, or any person who willfully, in a registration statement filed under this subchapter, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [3]
 Section 1341, Title 18 U.S.C., provides as follows:
 Frauds and swindles
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [4]
 Section 1001, Title 18 U.S.C., provides as follows:
 Statements or entries generally
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [5]
 Section 78ff, Title 15 U.S.C., provides as follows:
 Penalties
 (a) Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title or by any self-regulatory organization in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than five years, or both, except that when such person is an exchange, a fine not exceeding $500,000 may be imposed; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.
 
 
 [6]
 Section 371, Title 18 U.S.C., provides as follows:
 Conspiracy to commit offense or to defraud United States
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [7]
 Judge Frankel sentenced the appellants as follows:
 David Stirling, Jr. One year concurrent terms of imprisonment, one year of unsupervised probation, concurrent fines totaling $10,000, suspended sentence on the conspiracy charge.
 William G. Stirling Six month concurrent terms of imprisonment, one year of unsupervised probation, concurrent fines totaling $5,000, suspended sentence on the conspiracy charge.
 Harold Yanowitch One year concurrent terms of imprisonment, one year of supervised probation, concurrent fines totaling $2,000, suspended sentence on the conspiracy charge.
 Edwin Schulz Suspended sentence on all charges, one year supervised probation.
 Rubel Phillips Ten month concurrent terms of imprisonment, one year of supervised probation, concurrent fines totaling $5,000.
 Each of the appellants is free on bail pending this appeal.
 
 
 [8]
 This same pattern of behavior recurred in the spring of 1971, this time in response to an audit being done by Peat, Marwick, Mitchell & Co., Homex's new auditors. The Stirling brothers cancelled all of their interests in Hollyrood Park Associates. Peter Thun then paid two notes held by the Stirlings totaling approximately $35,000 as well as $22,000 on the Kece mortgage and, on March 16, 1971, signed a confirmation of the Kece mortgage to be forwarded to PMM
 
 
 [9]
 Ultimately, the Reseac principals sold the land to Yanowitch's former law partners, John Garrity and Bernard Frank. The government charged that Yanowitch coaxed Garrity and Frank into purchasing the Reseac land by assuring them that Homex would send them more legal work. Their legal fees from Homex did in fact increase substantially
 
 
 [10]
 The SEC statement noted that:
 The recognition of profit at the time of sale in accordance with generally accepted accounting principles is appropriate if it is reasonable to conclude in the light of all the circumstances that a profit has been realized. Profit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that the collection of the sales price is not reasonably assured. Thus recognition of profit is appropriate only when a bona fide sales transaction has taken place, and then only to the extent that the consideration received in the transaction can be reasonably evaluated. In some of the situations coming before us it appears from the attendant circumstances that the sale of property is a mere fiction designed to create the illusion of profits of value as a basis for the sale of securities. Moreover, even in bona fide transactions the degree of uncertainty as to ultimate realization of profit may be so great that business prudence as well as generally-accepted accounting principles would preclude the recognition of gain at the time of sale.
 Circumstances such as the following tend to raise a question as to the propriety of current recognition of profit:
 
 
 [1]
 Evidence of financial weakness of the purchaser
 
 
 [2]
 Substantial uncertainty as to amount of cost and expenses to be incurred
 
 
 [3]
 Substantial uncertainty as to amount of proceeds to be realized because form of consideration or method of settlement, e. g., nonrecourse notes, noninterest-bearing notes, purchase of stock and notes with optional settlement provisions all have indeterminable value
 
 
 [4]
 Retention of effective control of the property by the seller
 
 
 [5]
 Limitations and restrictions on the purchaser's profits and on the development or disposition of the property
 
 
 [6]
 Simultaneous sale and repurchase by the same or affiliated interests
 
 
 [7]
 Concurrent loans to purchasers
 
 
 [8]
 Small or no down payment
 
 
 [9]
 Simultaneous sale and leaseback of property
 
 
 [11]
 Section 180.15 of the New York Penal Law reads as follows:
 A person is guilty of bribing a labor official when, with intent to influence a labor official in respect to any of his acts, decisions or duties as such labor official, he confers, or offers or agrees to confer, any benefit upon him.
 
 
 [12]
 According to the prospectus in use throughout the 90 day delivery period for initial registrations, Pressprich had agreed to Homex's designating 117,500 shares for sale to certain persons "promptly upon the commencement of this offering and any shares not so purchased will be reoffered to the public at the public offering price."
 
 
 [13]
 William Stirling made no request of the district court to strike or narrow the indictment. We consider, infra, his argument regarding the denial of his Rule 29 motion for acquittal
 
 
 [14]
 Indictment P 16 reads as follows:
 
 
 [16]
 It was further a part of said scheme to defraud that on or about July 29, 1971, defendants David Stirling, Jr., William G. Stirling, and Harold M. Yanowitch prepared and filed with the SEC registration statements and other reports which described Homex's several relations with the United Brotherhood of Carpenters and Joiners of America and its locals. Those statements were materially false and misleading, because as the defendants well knew, but failed to disclose, seven members and officials of the United Brotherhood of Carpenters and Joiners of America had had approximately $240,000 worth of Homex common stock purchased for them at approximately $76,800 less than the fair market value, and afterwards, when the fair market price had fallen, approximately $64,000 worth of Homex common stock sold for them at approximately $136,000 above the market price
 
 
 [15]
 On July 12, 1977, the United States District Court for the Western District of New York, Harold P. Burke, Judge, granted David Stirling and Yanowitch permission to withdraw their pleas on the ground that the government had withheld exculpatory information. Stirling and Yanowitch made this motion just prior to the trial which led to the convictions we consider on this appeal. Judge Frankel and the government were informed of the withdrawal motion. Neither the pleas nor the convictions entered in the Western District were admitted as evidence in the Southern District. Appellants now request that we dismiss this appeal without prejudice and remand it to the Southern District pending disposition of their contemplated motion for a new trial. We deny the appellants' motion. See Fed.R.Crim.P. 33; United States v. DeSapio, 456 F.2d 644, 647 (2d Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed.2d 135 (1972); United States v. Sposato, 446 F.2d 779, 781 (2d Cir. 1971)
 
 
 [16]
 The agreement provided in pertinent part as follows:
 On the understandings specified below, the United States will accept a guilty plea from Edwin J. Schulz to one count of an Indictment charging a violation of 18 U.S.C. § 371 and carrying a maximum sentence of 5 years imprisonment and a $10,000 fine. If he fully complies with these understandings, Mr. Schulz will not be prosecuted by this Office for other existing charges known to this Office hereinafter specified, or for potential charges based upon information supplied to this Office by Mr. Schulz himself. Such immunity specifically includes charges related to securities, mail and wire frauds, perjury and false statements.
 The understandings are that Mr. Schulz shall truthfully disclose all information with respect to the activities of himself and others concerning all matters about which this Office inquires of him, and, further, shall truthfully testify before the Grand Jury and/or at any trial or other court proceeding with respect to any matters about which this Office may request his testimony.
 It is further understood that Mr. Schulz must at all times give complete, truthful and accurate information and testimony and must not commit any further crime whatsoever. Should Mr. Schulz commit any further crimes or should it be judged by this Office that Mr. Schulz has given false, incomplete or misleading testimony or information, or has otherwise violated any provision of this agreement, this agreement shall be null and void and Mr. Schulz shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecutions may be premised upon any information provided by Mr. Schulz, and such information may be used against him.
 No additional promises, agreements and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.
 
 
 [17]
 Rule 11(e)(6) provides as follows:
 Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel. (emphasis added).
 The language of Fed.R.Crim.P. 11(e)(6) and F.R.Evid. 410 is identical; their legislative histories are interconnected and complimentary. 8 Moore's Federal Practice P 11.08 (2d ed. 1977); 2 Weinstein's Evidence P 410; Advisory Committee Note to Rule 11(e)(6), reprinted in 62 F.R.D. 286 (1974); A.B.A. Standards Relating to Pleas of Guilty § 3.4 (1968).
 
 
 [18]
 In Hutto v. Ross, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976), rev'g Mobley ex rel. Ross v. Meek, 531 F.2d 924 (8th Cir.) (petition for writ of habeas corpus from state conviction), the Supreme Court considered the question whether a confession is per se inadmissible in a criminal trial because it was made after an agreed upon plea bargain that did not call for such a confession and before the withdrawal from the plea bargain. The Court held that it was not, and ruled that the Court of Appeals had erred when it determined that "any statement made as a result of a plea bargain is inadmissible." The Court also noted that the case did not "involve the admissibility in criminal trials of statements made during the plea negotiation process," referring to Rule 11(e)(6). Id. 429 U.S. at 30 n.3; 97 S.Ct. at 203 n.3. The implication, of course, is that not all statements made merely as a result of a plea bargain are excludable under Rule 11(e)(6) as statements made "in connection with, and relevant to" such a plea bargain
 
 
 [19]
 Judge Weinstein does suggest that a "grey area" exists regarding the admissibility under the rule of grand jury testimony that follows a negotiated plea but precedes the withdrawal of that plea when the defendant had negotiated the plea without benefit of an attorney. He concludes, however, that even under such circumstances "immunity seems unjustified." 2 Weinstein's Evidence P 410(07), at 410-41. Because Schulz had the benefit of an attorney throughout the bargaining process, he would have difficulty fitting into even this grey area, if indeed one exists. See United States v. Smith, 525 F.2d 1017 (10th Cir. 1975)
 
 
 [20]
 Fed.R.Crim.P. 14 provides in pertinent part as follows:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 Phillips' attorney broached the question of severance prior to trial, but decided not to make the motion at that time. The record shows that he believed the joinder of defendants under Fed.R.Crim.P. 8 was probably appropriate, but that he wished to reserve the possibility of moving for severance as the trial proceeded. The district court authorized counsel to make the motion at a later time. See Fed.R.Crim.P. 12(b)(5); 8 Moore's Federal Practice P 14.02(2) (2d ed. 1977).
 
 
 [21]
 Fed.R.Crim.P. 8 provides as follows:
 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.