MICHAEL J. GABLEMAN, J.
¶ 46. (dissenting.) I agree with the majority that Myrick made an offer to the State to plead guilty. However, unlike the majority, I believe that the exception in State v. Nash, 123 Wis. 2d 154, 366 N.W.2d 146 (Ct. App. 1985), applies to this case because a final plea agreement was reached. As a result, Myrick's testimony was properly introduced at trial.
¶ 47. The established rule from Nash is that Wis. Stat. § 904.10 does not bar testimony given after a plea *851 agreement has been finalized. The majority maintains that Nash does not apply in this case because "negotiations were ongoing when Myrick testified at Winston's preliminary hearing."[1] However, the majority also goes on to observe that "the prosecutor informed the circuit court that an agreement had been reached"[2] over a month prior to Myrick's testimony at Winston's preliminary hearing. These two statements cannot be reconciled. Put simply, the majority cannot have its cake and eat it, too — either the plea negotiations were ongoing or negotiations were concluded. The majority errs when it concludes that plea negotiations were ongoing at the time Myrick gave his testimony when, in fact, those negotiations had concluded. The State described its arrangement with Myrick as a "plea agreement" on numerous occasions. Moreover, a significant portion of Myrick's brief to this court is devoted to arguing that a plea agreement existed. I would therefore hold that Myrick's testimony was properly admitted pursuant to the long-established rule in Nash.
I. DISCUSSION
¶ 48. In Nash, the defendant provided testimony against others pursuant to a plea agreement with the State. 123 Wis. 2d at 149-50, 160. Nash later withdrew from his agreement and decided to proceed to trial, and his earlier testimony was admitted against him. Id. at 158. Nash argued that his testimony was inadmissible under Wis. Stat. § 904.10 because it was given "in connection with" his guilty plea, but the court of appeals disagreed, concluding that Wis. Stat. § 904.10 *852 does not bar testimony provided after a plea agreement has been reached. Id. at 158-60.
¶ 49. The court of appeals in Nash based its reasoning in part on two federal cases, United States v. Stirling, 571 F.2d 708 (2d Cir. 1978), and United States v. Davis, 617 F.2d 677 (D.C. Cir. 1979). In these cases, the defendants entered into plea agreements that required them to testify before grand juries, and the defendants withdrew from the agreements after testifying but before entering guilty pleas. Both Stirling and Davis concluded that the statements were not barred by Fed. R. Crim. E 11(e)(6), which contained identical language to Fed. R. Evid. 410. See Stirling, 571 F.2d at 730 n.17, 731-32; Davis, 617 F.2d at 682 n.13, 686. The federal courts reasoned that, notwithstanding the fact that neither defendant had entered a guilty plea, "exclusion of the grand jury testimony would not serve the purpose of the rule because the testimony was given after all of the negotiations had been completed and the plea agreement was formalized." Nash, 123 Wis. 2d at 159.
¶ 50. In Nash, the court of appeals concluded that the analysis in Stirling and Davis applies with equal force in Wisconsin, reasoning that the purpose of Wis. Stat. § 904.10 "is the same as the purpose of the federal rule — to promote the disposition of criminal cases by compromise." Id. The court of appeals explained that when a plea agreement has been reached, there is "no more negotiation and, therefore, no more reason to promote negotiation." Id. at 160. This is particularly true when, like Myrick's testimony, the evidence in question is testimony delivered under oath, because unlike statements made in connection with plea negotiations, testimony given under oath is presumed truthful. Id. We offer protection to defendants during plea *853 negotiations to incentivize truthfulness, but such protection is unnecessary when the defendant voluntarily agrees to testify under oath.
¶ 51. Like the defendants in Stirling, Davis, and Nash, Myrick entered into a plea agreement that required him to testify against another. Myrick later breached this agreement and decided to go to trial, and like these other defendants, his prior testimony was admitted against him. The purpose of Wis. Stat. § 904.10 is not served by excluding Myrick's testimony, because he had already formalized an agreement with the State and agreed to plead guilty. Likewise, there was no need to encourage Myrick to testify truthfully, because he had already agreed to provide truthful testimony as part of his plea agreement,[3] and his testimony was delivered under oath.
¶ 52. The majority relies on the terms of the State's proffer letter to argue that Myrick had not reached a formalized plea agreement with the State when he testified at Winston's preliminary hearing.[4] To address this argument, we must look to the terms of the State's proffer letter and the circumstances surrounding Myrick's testimony at Winston's preliminary hearing.
¶ 53. On July 2, 2010, four days before Myrick's case was scheduled for trial, the State sent Myrick a proffer letter with "an offer of resolution." The letter explained that the State sought "debriefing and testimony in any case involving criminal conduct of Justin *854 Winston." The letter proposed an agreement in which Myrick testified against Winston "in exchange for" the State's recommendation of a reduced sentence. According to the terms of the letter, the State would remain free to pursue "any or all investigative leads derived" from the debriefing, and after the debriefing was concluded, "it will be at the discretion of said district attorney's office ... as to whether the above negotiation will be conveyed to you to settle the above-captioned case short of trial." The letter also described Myrick's testimony against Winston as something that would occur "should we ultimately reach a negotiation in this case."
¶ 54. Myrick provided the State's requested debriefing on the same day the State sent its proffer letter. On July 6, 2010, the morning opening arguments were scheduled to begin in Myrick's trial, the State informed the circuit court that a "resolution had been reached" between the parties. In response, the circuit court discharged the jury and scheduled the case for a status hearing.
¶ 55. On August 13, 2010, Myrick testified against Winston at Winston's preliminary hearing. Shortly thereafter, on September 9, 2010, and February 24, 2011, the parties appeared for status hearings before the circuit court and requested that the case be set over pending Myrick's testimony at Winston's trial. The parties then informed the circuit court on May 23, 2011, that they wished to schedule a date for entry of a plea after Winston's trial had concluded. At the plea hearing two months later, the parties told the circuit court that Myrick had refused to testify in Winston's trial and, as a result, Myrick would not be entering a plea and the parties would proceed to trial.
*855 ¶ 56. The facts in this case clearly demonstrate that Myrick had entered into a formalized plea agreement with the State that required his testimony in Winston's trial. I agree with the majority that there was no formal plea agreement when the State wrote its letter; rather, the letter simply explained that the State wished to debrief Myrick and, based on the information he provided, it may choose to enter a plea agreement with him in which he would testify against Winston "in exchange for" a reduced sentence. This comports with common sense, as the State would have no incentive to offer an agreement to Myrick until it ascertained what Myrick knew and would be willing to testify to under oath. Therefore, the State indicated in the letter that "[ajfter the substance of the proffer/debriefing is conveyed to the Milwaukee County District Attorney's Office ... it will be at the discretion of said district attorney's office ... as to whether the above negotiation will be conveyed to you to settle the above-captioned case short of trial." The majority confuses the negotiation process — which continued through Myrick's debriefing — with the terms of Myrick's finalized plea agreement, which included his testimony at Winston's preliminary hearing in exchange for a reduced sentence.
¶ 57. In other words, the letter recited the terms of a possible future plea agreement. Myrick would testify for the State "should we ultimately reach a negotiation." (Emphasis added). There is a difference between the process of negotiation, which may or may not result in an agreement, and reaching a negotiation, which is an agreement by another name. Because the State ultimately "reach[ed] a negotiation" with Myrick, Myrick in turn testified for the State.
*856 ¶ 58. Although there was no further written correspondence between the State and Myrick, it is obvious that the State ultimately opted to enter into a formalized plea agreement with Myrick after his debriefing, because pursuant to the terms of the proffer letter, Myrick later testified against Winston, and the parties scheduled a date for entry of a plea. If there had been no plea agreement, the parties would not have scheduled a plea hearing, and Myrick would not have testified for the State. As Myrick's brief to this court makes clear, even he agrees that a plea agreement had been reached:
Why would Myrick, in the middle of a first degree intentional homicide case and after exercising his right to remain silent for over one year, make incriminating statements in open court, unless he had the benefit and security of a "plea agreement?"
A review of the record shows that the existence of a plea agreement was never in doubt. For example, when the parties argued before the circuit court as to whether Myrick's testimony should be admitted, Myrick's counsel explained, "the only reason [Myrick testified] was because of the agreement he made pursuant to the proffer letter. . . Likewise, if the parties had not reached an agreement, the State would not have informed the circuit court on the morning of trial, after a jury had already been selected, that "a resolution had been reached" between the parties. Absent a plea agreement, the parties would have had no apparent reason to delay scheduling a trial through two subsequent status hearings and then specifically request a plea hearing on a date following Winston's trial. Nor is it likely that the circuit court would have discharged the jury and sched *857 uled a status hearing or agreed to schedule a plea hearing without a finalized plea agreement.
¶ 59. The State also referred to the plea agreement between the parties in describing what testimony it wished to read to the jury: "Where I am gonna end is [line] 25, because then it goes into the plea agreement and what the plea agreement was, and that he had a plea agreement to testify." The circuit court responded, "No, we're not getting into any plea agreement." The State also asked Myrick's counsel if he wanted the jury to hear that "[w]e would recommend 12 to 13 years and he was willing to plead guilty to the charge of felony murder?" Myrick's counsel replied, "I — excise the portion about the plea deal, fine." Later, the State claimed, "The jury will know the reason he is giving testimony is pursuant to a proffer where he has a - agreed to plead guilty to felony murder and do 13 years in prison." In sum, upon review of the record and the parties' briefs to this court, there is no question that Myrick's testimony at the preliminary hearing was given pursuant to the terms of a finalized plea agreement with the State.
¶ 60. The majority's position is that, while Myrick made an offer to plead guilty, that offer never materialized into a formal plea agreement and remained in the negotiation phase at the time Myrick testified at the preliminary hearing.[5] This position raises the obvious question: at what point, under the majority's reasoning, would the parties' negotiations have transformed into a plea agreement? The majority provides no clear guidelines to indicate when the exception in Nash would apply. Although the majority notes that "the State never amended the charge, and Myrick *858 never entered a plea,"[6] this clearly cannot be the baseline for when a plea agreement has been reached, because in both Stirling and Davis — the federal cases relied upon in Nash — the defendants never entered a guilty plea but still testified in accordance with a plea agreement. It cannot be reasonably argued that a plea agreement exists only once a defendant has formally entered a guilty plea. Entry of a guilty plea is a condition of a plea agreement, but the agreement must exist prior to the actual plea — otherwise, how would the defendant know whether to plead? The majority is left concluding that there was no plea agreement, without ever indicating how to determine whether a plea agreement exists. In this case, the State expressly referred to a plea agreement, Myriek maintains there was a plea agreement, and the circuit court believed there was a plea agreement. If this is not enough to conclude there was an agreement, it is difficult to fathom what is.
¶ 61. I also note that the majority's rationale may have far-reaching practical implications for future cases. No great imaginative leap is required to envision a scenario where the State elicits testimony from a defendant pursuant to a proffer letter like Myriek's, only to later claim that the parties never reached an agreement and refuse to fulfill its end of the bargain. If the majority is correct that no plea agreement existed between the parties, nothing would have prevented the State from refusing to recommend a reduced sentence even if Myriek had testified at Winston's trial. This preposterous result is the natural extension of the majority's reasoning, but its unfairness is self-evident. Although this cannot possibly be the law, the majority *859 opinion does not merely invite such a conclusion; the majority opinion would, in fact, require it.[7]
¶ 62. The established rule from Nash is that testimony provided pursuant to the terms of a plea agreement is not barred by Wis. Stat. § 904.10. The facts in this case — from the State's proffer letter and the parties' statements to the circuit court, to the circuit court's own comments and its decision to discharge the jury and later schedule a plea hearing — all unequivocally indicate that Myrick's testimony was delivered as part of a finalized plea agreement with the State and was admissible under Nash. For this reason, I respectfully dissent from the majority opinion.
¶ 63. I am authorized to state that Justices DAVID T. PROSSER and ANNETTE KINGSLAND ZIEGLER join this dissent.

 Majority op., ¶ 38.

 Majority op., ¶ 33.

 The State's proffer letter to Myrick explained that if Myrick debriefed the State and the State then decided to enter into a plea agreement with Myrick, the State would recommend a reduced sentence "in exchange for" Myrick's "truthful testimony" against Winston.

 See majority op., ¶ 38.

 See majority op. ¶¶ 32, 38.

 Majority op. ¶ 39.

 Moreover, even if the majority is correct in its assertion that Myrick's testimony should not have been admitted during the State's case-in-chief, it is not at all clear that the testimony will be inadmissible in Myrick's new trial following this decision. The State's proffer letter clearly stated, "nothing shall prevent the State... from using the substance of the proffer/debriefing at sentencing, or for any purpose at trial for impeachment or in rebuttal to testimony of your client... ."